Your Honor, it's the first case of the morning, call 211-0098. Keating State of Illinois v. Anthony G. Robinson. On behalf of the Appellant, Mr. Patrick Carmody. On behalf of the Appellant, Mr. Jay Ball. You ready to proceed? Yes, Your Honor. May it please the Court, Counsel. Your Honor, Mr. Robinson has requested hair analysis on the knee-broke hairs found on the murder victim's body and her hands. To see if they belong to Paul Williams. There was evidence... Well, but will they show that they belong to Paul Williams if he's successful? Or will they show something else? Well, they'll show that it could have belonged to Paul Williams. And given the fact that the defendant was bald, and this was the testimony presented at trial, we believe it would be materially relevant to the defendant's case. How does that add anything to what was presented at trial already? We know he was bald, so he's already been excluded, he being your client. So we already know that it could be Williams' hair or it could be somebody else's hair. If the test comes back to exclude Williams, the defense is on the water. If it comes back to possibly include him, it adds nothing to what was already presented at trial. Well, we respectfully disagree with that assessment. That would support the cocaine salesman of the defendant, Mr. Ewells, that he saw Mr. Williams go into the victim's apartment on the night of the murder and heard some bumping and noises. And when Mr. Williams came out of the apartment, he was hot and sweaty and out of breath, which would support the defendant's theory that he's the one who committed the murder. There was evidence presented at trial that there was quite a bit of a violent struggle. The victim was beat up rather badly and had several injuries indicative of a raucous incident. Where was the victim's apartment with relationship to Williams' apartment? That's unclear from the record, Your Honor. There's differing testimony. Certainly there's some evidence indicating that Ewells testified that the victim lived on the wrong floor. Our point on that would be that if it comes back to possibly include Paul Williams, that that would explain they just made a mistake on what floor that they were on when they supposedly went into her apartment. Well, he knew where Williams' apartment was. That's not an issue, correct? Correct. No, that was what he was there for, was to sell him cocaine. Apparently had some information that Mr. Williams would buy cocaine. I just point out the fact that everybody's using cocaine in this case might indicate why they got the floors of the apartment building. What we don't know is that the defendant is using cocaine, do we? I don't know. I really don't know Mr. Ewells is using it either. He's selling it, but we don't know that he's using it. I think there was some testimony, and I could be wrong on this, Your Honor, but I think there was some testimony that they used up the original sale of cocaine and then Williams bought some more. I think that would tend to support that they were using cocaine. Did any barker, the court barker, find that this type of evidence wouldn't be new, non-cumulative evidence based upon, at least in part, the limitation of YSTR testing? That's definitely the case in that case, yes, Your Honor. It does limit it, but it doesn't preclude its relevance or its material relevance in this case in the defendant's opinion. The state has responded that 116.3 has been misinterpreted and should not be read as written. The state bases this argument on a grammatical interpretation that I will admit I'm not entirely sure that I understand completely. But it appears the state's complaint is that the defendant is having a second bite of the apple. In that regard, the state is absolutely correct. Indeed, that is exactly what the statute is designed to do. Moreover, several aspects of criminal jurisprudence allows the defendants the so-called second bite of the apple, a direct appeal, a petition for post-conviction, relief, petition for relief from judgment, and of course— Yeah, but usually that's tactical, strategic decisions. I mean, if you make a tactical, strategic decision to not have something tested, so you can make this argument that maybe it is Paul Williams, and then you're convicted, that didn't work. Then you come back and you get your second bite of the apple on what's clearly a strategic— I mean, we found that in the earlier case. It was a strategic, reasonable, tactical decision that was made by defense counsel. I would respectfully disagree that it was a reasonable trial strategy for trial counsel. The defendant had already been linked to the victim's DNA through blood on his own genes, which he admitted at trial were his genes. Well, so you're asking us to disavow the earlier holding. No, I'm not asking you to, but I believe that it was more relevant than perhaps that was led on to believe. I don't think that's a very good trial strategy when you've got the blood evidence and your defendant is bald. Why not have it tested to see whose it is, if it can be determined whose it is? Well, it could have been the African-American police officer. Absolutely, it could have been, but that would be an argument. Then your defense is out of the box. I mean, then you can't argue what you want to argue about Williams. Well, if they're both included, I think we could. So the first time around, there was no request to do, by the defense, to do any additional DNA testing, correct? Correct. The hair was not tested. They stood on the state's analysis or report of the analysis. Right. As I was saying, all of these avenues are designed to allow the defendant to review a case against him with the idea of not keeping innocent defendants incarcerated, a fact which the state seems to gloss over. Your Honor, I could go into some of the case law on this, but I think you're probably familiar with it. I would just mention People v. Hockenberry, where the court ordered DNA testing of the fluid found in the victim, who was the defendant's ex-wife. He was convicted of aggravated criminal sexual assault and home invasion. Now, YSTR testing was available at the time of this trial, correct? I believe, yes, sir. So, I mean, I think what the state's argument is, this grammatical argument that you're talking about, and I don't want to put words in their mouth, but in this case, you had some hair that was subject to YSTR testing but not subjected to that testing. Correct. I mean, it was clearly subject to that testing, and it was chosen not to be tested. That's absolutely correct. So why is that reading of the statute incorrect? I mean, I know Boatman reads it that way, but... Boatman reads it that way, and this court read it that way. In Rosa, with Justice McClaren writing, he even used the verb subjected to testing, had not been subjected to testing. And so we think that that analysis by the state is wrong. If it hasn't been tested, the defendant gets to test it, if it will be materially relevant to his case. Well, don't we have to get to that point, material and relevant, before we get to the second, you know, subject, subjective? Or wouldn't that seem to make sense in terms of analysis in this case? Well, if you find that it's not materially relevant, we obviously would, the defendant loses. I mean, that's the case whether we do it one or two, it doesn't really matter. Here, the testing of the knee growth hairs could come back matching someone other than the defendant, and particularly if it came back to include Williams as a match, this would be materially relevant to the defendant's case. If there's no further questions? In terms of the DNA, isn't it like, the DNA that was found on the jeans, or the blood on the jeans, isn't it likely that the trier effect just didn't believe that, you know, this theory that, well, yeah, I got on my jeans when he slapped the money at me, or here's your money, and kind of flipped it at me? I mean, don't we have a credibility issue that really isn't going to be solved by the testing that's requested? Well, I beg to differ in the sense that if the defendant's theory proves to be correct, he'd have another bullet in the chamber to be able to use at a jury trial that, hey, that story is backed up, at least to some extent, by the fact that Paul Williams was included as a match. But Mr. Williams never had any blood on him, did he? I don't think that's in the record, Your Honor. I don't know. I don't think so. Thank you. Thank you. Jury's charging? May it please the Court, Counsel? I am Jay Halfman, the State's Attorney's Appellate Prosecutor, and as always it's my pleasure to represent the people of the state of Illinois before this honorable Court. There are two general reasons that this Court should affirm the denial of 116.3 testing as was done at the Circuit Court. First of all, contrary to what Counsel just argued, no testing could significantly advance the claim of actual innocence raised by the defendant here. Second of all, and actually procedurally this may go first, but it's more complicated and so I will take that second. It's my argument that the statute has been misconstrued by Boatman, and indeed this Court sort of followed that impersonally, and I think, again, the statute has been misconstrued and I'll deal with that later. As far as the fact that it would not significantly advance the defendant's claim of actual innocence, that also has two reasons. First of all, as some members of this Court have alluded to, YSTR testing does not identify anybody. It can put you in a category the same as the old PGM blood testing or the ABB blood testing, but it cannot figure a specific person. And in that regard, as was also mentioned before, the trier of fact, the judge here, knew that the defendant was bald, could not have been his hair. He knew that the only black person in that apartment building was Williams, and he knew that there was a black police officer at one time. And how many people are included in this, as you say, class or category by this testing? I don't know. I think that varies with... It, of course, zeroes in on the male or Y chromosome, and I think that can vary depending upon what the structure is of that particular chromosome. But it cannot zero in on any particular person, even if it could, Your Honor. Even if it could say, this is Mr. Williams' hair. Mr. Williams lives in that apartment. Mr. Williams certainly knew the victim because she was the manager of the apartment building. She could have gotten that hair through any interaction with him. And this court has already said on post-conviction that it is not, that the evidence here, the testing of the hair, would not be, not that it isn't relevant, but it would not advance a claim. Indeed, this case said that it was of little probative value. This court said it was of little probative value, and that here, in order to get testing, he has to claim that it would significantly advance his claim of actual innocence. I submit that this court's prior holding absolutely forecloses any such finding. So, therefore, in your opinion, putting Mr. Williams, if that happened, in this category,  would not assist, because now we'd have at least three possible people in the category, or two people in the category and one blood sample that puts the defendant in the vicinity. You don't believe that having that maybe murky area significantly advances the claim in this matter? No. And again, I would say this court said that before, because he came back on post-conviction and said, hey, counsel was ineffective for not having this tested, and this court said it's of little probative value. The judge knew he was bald, the judge knew that Williams was there, and that there was a black police officer, and yet this court agreed that it was of little probative value. And I would say in this case, he's not asking for a second bite of the apple, he's asking for a third bite. He's gotten his second bite by saying counsel was ineffective, and this court rejected that claim. Going on with that, the other evidence also teaches that it would not significantly advance his claim of actual innocence. We have Ewells, and Ewells, the circuit court, sitting as finder of fact, absolutely found, was totally incredible. The man's been in and out of mental hospitals, the man's ex-girlfriend said that she wouldn't trust a thing he said, he has prior convictions, he told a different story to the police in this case, the defendant is very much the same, he has prior convictions and he told different stories. He alleged that he wasn't there at all, hadn't been close to that building in the six months since he had been evicted, and yet he later admitted, as was testified to by the bartender across the street, that he went in there and bought a beer. Another person testified that they'd seen him arguing with the victim in the parking lot that day. It was only after that that he admitted he'd been there. Then there's the conflict between his testimony and Ewells itself regarding who made the first transaction with the money and stuff. Who bought beer, did they buy beer later? What time were they there? That conflicts with the story of Ms. Schindelhammer, who came home from work, and Mr. Williams and his roommate, Mr. Russ, who said that during that time they were downstairs cleaning up a broken window in the front door and then tried to go to the victim's apartment and ask her, tell her what had happened, and they couldn't find her. Would you agree that this hair evidence would be relevant to the defendant's claim of actual innocence? Yeah, relevance is a very low standard, Your Honor, and it has any tendency. Would you agree that it's materially relevant? No, because materially relevant for purposes of this statute, as Savory tells us, is that it must significantly advance his claim of actual innocence. That it cannot do, both because of the evidence here and because of the fact that YSDR cannot pinpoint him. And while I'm on the evidence, I want to apologize for a misprint at page 18. I said I think that the defendant and Williams said that Williams' apartment was on the second floor. It was Ewell and Williams, I'm sorry, Ewell and the defendant who said it was on the second floor. And in fact, contrary to what I think I heard counsel say, that's not correct. It's not on the second floor. The victim's apartment was on the second floor. Williams is on the third. Therefore, when Ewell said, and by the way, as I also think I heard counsel misstate, no one ever said that it was the victim's apartment. He didn't know what apartment it was, Ewell didn't, who was with Williams. He didn't know where the sounds were coming from, but if it was coming from the apartment he went into. All he said was, we went out of Williams' apartment, went down a few doors, and he went into apartment. Well, that can't be, because Williams' apartment is on the third floor, the victim's apartment is on the second floor. There's just no credibility to any of these claims. And again, the trial judge knew these facts from other testimony that had been presented. Absolutely, Your Honor. If there are no further questions on that portion of it, I will move on and try to explain my argument with regard to the statute. This Court well knows that the two well-recognized principles of law, that is that in a statute, if there are separate sections, it is presumed that the legislature intended those separate sections to mean different things. No part of, absent any other evidence, no part of the statute should be regarded as redundant. Second of all, when the legislature uses different words in different areas, they mean different things. And it's very important to look at how this statute was changed. Originally, it talked about evidence that was not subject to testing because the technology for that testing was not available at the time. In People v. Laming and then People v. Brooks, the Supreme Court following Laming, those courts found, well, in order for a defendant to get testing, he's got to come in and say that the testing was not available for this specific purpose, that it was not, the technology was not there. Two years after that, the legislature changed the statute and split it into A sub 1, A sub 2. In addition, of course, they added the IBIS testing, but that's not relevant here. A sub 1 now says, in order to get testing, it had to be not subject, no, let me make this clear, was not subject to the testing which is now requested at the time of trial or, although previously subjected to testing, can be subjected to additional testing utilizing a scientific method that was not available at the time of trial. Well, the defendant here cannot win under either one of those because it was subjected to testing. Second of all, it was not subject to the testing which is now requested at the time of trial because I would disagree, I think, why STR at that time was not available. And so, I'm sorry, it was available and so it was subject to the testing but he chose not to test it. The second is, if it was subjected to testing and he can show that this new type of testing, and that would be DNA testing as I've argued, the type of testing, this new type of DNA testing is available, then he can get that because he tried what he could do. And I would disagree what- Does A1 only talk about evidence that is just like newly found or something? What would that, I mean, the way Bolton reads it is you have evidence that was not tested, evidence that was tested. Two groups of evidence, you treat them differently. Not tested under A1, tested under A2. Under your analysis, you have stuff that wasn't tested, but it was there, could have been tested. You're saying A1 doesn't apply to that. So what would A1 apply to? A1 would apply to if DNA testing was not available. And remember, they took out the language. The Supreme Court in Brooks and Lanning said it was limited to testing was not available because the technology was not then in existence. They took that out, at least they took it out of one. They took it away from the word subject and put it with the word subjected, which teaches us that what they were saying was if the testing was available and you did it, then you should not be punished just because a new type of DNA testing has come along. And that's where I would quibble with counsel. He says, well, the statute gives you the second bite of the apple. No, it doesn't. The statute says if there was no biting to be done and you did all you could do, it's not your fault. Therefore, if there was a type of DNA testing and a new type comes along, that's not a second bite. It's not fair to cheat you for not being able to do that at the time. However, the legislature certainly doesn't think that someone can say, you know, I could have this tested. It's subject to testing. It's possible to test it. But I'm not going to do it because then I can argue, well, the police didn't do it. They were shoddy. And then I can come back in post-conviction and say, counsel was shoddy. And then I can come back again and say, oh, well, you know, I changed my mind. I want this tested. I think that it's clear the legislature did not intend this. They were not looking towards second bites of the apple. They were looking at situations where because of the technology at the time, you could not get a bite of that apple. What does A1 apply to? A1 applies to, it says it was not subject to the testing which is now requested at the time of trial. That would be something that was not in existence. If DNA was not there or because they took off that language about it didn't have to be the technology, I'm assuming there are other reasons that it was not subject to the testing. For instance, if you had the evidence but no one had noticed a particular stain on it, that wasn't subject to the testing because no one knew that was there. There could be other reasons and, you know, I don't know, but they took off. So basically newly discovered evidence, is that what you're limiting this to? Well, I wouldn't equate that to newly discovered evidence because we know that newly discovered evidence can be treated under, you know, the post-conviction. It's different. Plus, this statute specifically talks about evidence that was garnered at the time of the original trial and has had a change of custody. So I don't think newly discovered evidence really fits to this. I realize that's kind of technical, but unless you would say, well, this new stain is newly discovered evidence, I don't think that's a proper way to look at it. It may be that there are other reasons it was not subject to the testing. But my argument is basically, again, Section 1 says subject. Section 2 says subjected. Those are different words. And I think that courts have been – courts have not understood that they're different words. With no offense to this court, in Rozo, this court dealt with a 1 but spoke of subjected. I would say that's wrong. Again, the well-accepted law says when the legislature uses different terms, it means different things. Here, certainly the legislature didn't expect the defendant to be given two or even three bites of the apple. If there are no further questions, Your Honor, I would ask this court to affirm the denial of the 116-3 motion. Thank you. Your Honor, my remarks will be very brief. First, we have to remember we're only asking for a test. We're not asking for a new trial. Counsel acknowledged that he can't put a number of that – someone who would fall in – what the range is, how big it varies within these different markers. Let's have the test. Let's see how big that range is. And then make the determination whether that warrants a new trial. Hockenberry rejected the state's argument that they have an easily explainable way to explain how someone other than the defendant's fluid could have been in the victim. Well, that's true. They have a reasonable argument here, too. Paul Williams was a tenant. She was the landlady. It's possible. But if the category that he falls under is narrow enough, I believe that can be overcome. I mean, here factually we have at least two other African-American persons who could have, according to your theory or the theory, put that hair or lost that hair in the vicinity of the victim. What if we only had – and because we don't know how big or how small this class of people is, it's difficult for me to figure out how this would forward your case. Would it be different if Mr. Williams were the only person other than the only person there? Would your argument be any different? Well, it would be stronger, but I wouldn't say. But not terribly stronger because the theory is that the hairs were taken out during the struggle. The idea that someone just willy-nilly deposits hair to the point where it's in someone's wastebasket seems a little far-fetched to me. He would never have a Labrador retreat. I'm talking human hair. I've got a dog. I know about that. Just in passing, the counsel's argument that the former girlfriend would call the defendant – or witness the liar and the defendant a liar, I think most former girlfriends and boyfriends might not be very fond of their ex-boyfriend or girlfriend. To refresh my recollection, exactly where were those hairs found? It's not completely clear from the record. Some are found on her body. There are some found on her hands. On her clothes, on the plastic bag? It appears, yes. It appears, at least the state's theory was, that the wastebasket bag was used to asphyxiate the victim and that there was garbage in the wastebasket. And some of that accounted – there were other things like tissues and things like that, if I recall correctly. Again, though, why would someone's hair be in your wastebasket? That doesn't seem very likely to me. Your own hair, perhaps, between your combs and your brushes, but somebody else's, it doesn't seem very likely. My question is, where exactly was it found? On the plastic only? No. They found it on her chest areas and in her hands. Was there any testimony that the officer – the gentleman who was the African-American officer – I assume it was a man. I believe it was a man, yes. When he came in, did he touch the victim? Is there any indication that he might have been in close proximity, checking to see if there were vital signs, anything like that? Not to my recollection, Your Honor, and a trained police officer should know enough to leave the privacy alone. I agree with you, but is there anything that would indicate how close a proximity he might have been to her, to the victim, to explain how his hair might have gotten in three specific areas? Other than probably testing to see if she was alive or not, but I think it was pretty clear that she wasn't, so I don't think there is anything in the record, but I could be mistaken about that, but I don't think so. As for the grammatical argument by counsel, I would just read from Rozo, however, Section 116.3 allows for comparison of analysis of evidence not subjected to testing at the time of trial. That's the standing case law as it is. Of course, Boatman would also support that finding, and we believe that's the correct interpretation of the statute, given its plain language, and if there's no further questions. Thank you, Your Honor. Thank you very much. It will be a decision in due time.